**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Sakia Fletcher

*Plaintiff,*

v.

Medgar Evers College, City University of New York,
Rudolph Crew, *in his capacity as President of Medgar
Evers College*, Felix V. Matos Rodríguez, *in his
capacity as Chancellor of the City University of New
York*, Alexis McLean, *individually and in her capacity
as Dean of Medgar Evers College*, Johnathon P.
Hardaway, *individually and in his capacity as Chief
Legal Officer for Medgar Evers College, and*
Councilwoman Laurie Cumbo,

*Defendants.*

Docket No. _____

**COMPLAINT**

## PRELIMINARY STATEMENT

1.      This civil rights action is brought to remedy and expose naked and malicious

retaliation and corruption, to wit, that the gravest disciplinary powers available within the City

University of New York ("CUNY") framework were brought to bear without any process in an

attempt to railroad and punish Medgar Evers College ("MEC") student Sakia Fletcher for having

the audacity to participate in city government and exercise her First Amendment rights to

peacefully criticize and protest the official acts of Councilwoman Laurie Cumbo.

2.      In brief, on April 30, 2019, Ms. Fletcher attended a characteristically contentious

meeting of Community Board 9, which was holding its meetings on MEC's campus.  Seemingly

at Councilwoman Cumbo's request, she was removed from the meeting by MEC security (which

removal Ms. Fletcher cooperated with fully).

1

3.      The very next day, Ms. Fletcher was suspended by MEC without any process or even notice of any allegation.  As explained below, MEC did not ever make any of the findings necessary to do so, nor did it apparently even receive a complaint.[1]  Indeed, though the CUNY Bylaws require that either the college president or his designee make a determination prior to the kind of suspension Ms. Fletcher received, no such designation exists and no determination was ever made.

4.      Subsequently, MEC, acting through Dean of Students Alexis McLean and MEC General Counsel Johnathon P. Hardaway, continued to implement various directives from Councilwoman Cumbo, in flagrant violation of the CUNY Bylaws and the procedural protections supposedly in place to protect students, in continued attempts to force Ms. Fletcher to simply roll over and be quiet.  Indeed, MEC obeyed a specific directive from Councilwoman Cumbo that MEC should disregard the CUNY Bylaws:

> "Please share with your colleagues and senior leadership that the Majority Leader would like [Ms. Fletcher's disciplinary] hearing to be to "closed" to the public, and she would appreciate only the essential participants to be part of the hearing."

5.      Ms. Fletcher retained counsel and ultimately prevailed in a disciplinary hearing on a motion at the close of MEC's case — not even needing to present a defense.  During that hearing, MEC presented a single grainy video and testimony of security officers that completely undercut many of allegations in the disciplinary complaint.

6.      No source or factual support of any kind was ever provided for many of the allegations.  For example, there was no testimony that Ms. Fletcher "resisted" being lead out of the meeting, and in fact, the video (to the extent it was discernable) showed the exact opposite.

---

[1]      As noted below, this is what MEC has asserted in FOIL practice, though it seems somewhat implausible. Upon information and belief, if it did receive a complaint, it took the form of a phone call from Councilwoman Cumbo's office to MEC, demanding MEC take certain, retaliatory actions.

7.     In short, the entire proceeding was a sham, carried out in an explicit attempt to chill criticism of Councilwoman Cumbo.

8.     Even read charitably, Defendants forced these proceedings forward without any consideration of the time, burden, or stress it placed upon Ms. Fletcher.  Read less charitably, the Defendants attempted to use that timing to increase the pressure for Ms. Fletcher to cease her constitutionally protected speech.

9.     Indeed, throughout the process, MEC failed to even **once** give Ms. Fletcher the required notice of a hearing, despite rescheduling the hearing twice.

10.     Thus, and as set out below, this action is brought to vindicate Plaintiff's rights under the First, Fourth, and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, as amended, codified as 42 U.S.C. § 1983, the attendant provisions of the New York State Constitution, including, but not limited to, Article I, §§ 8, 9, 11 and 12 thereof, and New York State common law.

11.     The Defendants' unconstitutional actions constitute an ongoing violation of Plaintiff's rights because the Defendants have not withdrawn the allegations or otherwise vacated the initial suspension against Plaintiff and thus – despite the dismissal of the subsequent charges against Plaintiff – the allegations and initial suspension continue to chill her speech and mar her record in violation of the freedom of speech protections afforded by the First Amendment.

12.     Further, due to the Defendants' unwillingness to denounce the unconstitutional actions taken against Plaintiff and to document said denunciation in the same manner they accused Plaintiff, Plaintiff now lives under the constant threat of an existing accusation on her record thus making her more vulnerable to future false accusations from the administration.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

14.     The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fifth, and Fourteenth Amendments to the Constitution of the United States.

15.     The Federal Declaratory Judgment Act, 28 USC §§ 2201 and 2202, authorizes this Court to grant Plaintiffs the declaratory relief they pray for herein.

16.     Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to grant Plaintiff the injunctive relief she prays for herein.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that the Defendant CUNY's main office is in this District, and the CUNY system is the system in which all the defendants operate.

18.     Pursuant to New York State General Municipal Law ("GML") § 50-e, Plaintiff filed timely Notices of Claim with the New York City Comptroller on or about July 29, 2019, within 90 days of the events herein complained of.

19.     Plaintiff's claims were not adjusted by the New York City Comptroller's Office within the period of time provided by the GML.

20.     The Court has pendent jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they share a common nucleus of operative facts and are so related to the federal claim as to form part of the same case or controversy, and Federal questions necessarily predominate over any state law claims.

21. Plaintiff only seeks forward-looking injunctive and declaratory relief against CUNY/MEC, through their respective President/Chancellor and the individual CUNY/MEC Defendants under *Ex Parte Young*.

22. Specifically, Plaintiff seeks:

a. a written statement from the Defendants expressly withdrawing the allegations previously made against Plaintiff as detailed herein, and denouncing their unconstitutional actions against Plaintiff which should be documented in writing and in the same manner in which the accusations were initially made;

b. a declaration and judgment that the disciplinary process involved here, including the CUNY/MEC Defendants' implementing politically motivated directives from Councilwoman Cumbo, was unconstitutional; and

c. all further declaratory and injunctive relief detailed below.

## PARTIES

*Sakia Fletcher*

23. Ms. Fletcher was at all times relevant to this action as a resident of the County of Bronx in the State of New York, with a primary place of residence at 689 East 232 Street, Bronx, NY 10466.

24. Ms. Fletcher is a student at MEC, a single mother, and — even according to the Defendants — well-liked and respected in her community.

25. Prior to April 30, 2019, Plaintiff Fletcher worked in the office of the Dean of Students as part of her work study/CUNY Service Corps work.

26.     She also was, at the time of the incident, the President-Elect of the MEC Student

Government.  She has since stepped into the role of full President.

27.     Plaintiff Fletcher attends Community Board 9 meetings as part of her active

approach to her role in the Student Government Association, most recently as its president-elect.

That is, she attends to raise issues including the lack of necessary athletic facilities to

accommodate the college's sports teams and the still-in-use portable trailers which were

supposed to be temporary when they were installed 15 years ago.

***City University of New York ("CUNY")***

28.     Defendant CITY UNIVERSITY OF NEW YORK ("CUNY") is the public

university system of New York City.

29.     Upon information and belief, CUNY is the largest urban university system in the

United States, and is made up of 26 separate campuses — including Defendant Medgar Evers

College — with an annual budget of over $3 billion and serving nearly 300,000 students.

30.     Upon information and belief, CUNY's central office exercises final control and

executive authority over its member campuses.

31.     It is CUNY's bylaws that should have prevented Defendants from engaging in the

systematic and deliberate violations of Ms. Fletcher's rights.

32.     As described below, CUNY is also liable for the acts of Alexis McLean,

Johnathon P. Hardaway, and MEC under the doctrine of *respondeat superior*.

33.     Upon information and belief, the main corporate office of CUNY is located at 205

E 42nd St, New York, NY 10017.

***Medgar Evers College***

34.     Defendant MEDGAR EVERS COLLEGE ("MEC") was at all times relevant to this action, upon information and belief, located at 1650 Bedford Ave #2010, Brooklyn, NY 11225.

35.     Plaintiff attends MEC.

36.     MEC employee defendants Alexis McLean and Johnathon P. Hardaway, and, as described below, is liable for their acts under the doctrine of *respondeat superior*.

37.     Any student disciplinary proceedings at MEC are governed by and subject to the CUNY Bylaws.

38.     Plaintiff seeks only declaratory and injunctive relief against MEC.  *See e.g., Salerno v. City University of New York*, 191 F. Supp. 2d 352 (S.D.N.Y. 2001).

**Councilwoman Laurie Cumbo**

39.     Defendant Councilwoman Laurie Cumbo ("Councilwoman Cumbo") was at all times relevant to this action as a resident of the County of Kings in the State of New York.

40.     Upon information and belief, Councilwoman Cumbo is the Democratic council member for the 35th District of the New York City Council.

41.     Upon information and belief, Councilwoman Cumbo's primary place of business is located at 55 Hanson Place, Suite 778 Brooklyn, NY 11217, and her primary place of residence is unknown to Plaintiff.

42.     Upon information and belief, Councilwoman Cumbo has a reputation for taking very pro-developer positions, which position Ms. Fletcher has exercised her First Amendment right to criticize, protest, and call public attention to.

43.     For example, according to a Daily News report, Jonathan Westin, executive director of New York Communities for Change, said bitterly of her support of a project

7

championed by Councilwoman Cumbo (and opposed by Plaintiff), "This so-called deal is an

insult to the people of Crown Heights, who will undoubtedly be displaced as a result of this

project.  This is on Laurie Cumbo."  *See* Erin Durkin, City Council strikes deal to approve

Brooklyn's Bedford Union Armory project, NEW YORK DAILY NEWS (November 21, 2017),

available at https://www.nydailynews.com/news/politics/city-council-strikes-deal-approve-

bedford-union-armory-project-article-1.3648721.

### *Alexis McLean*

44.     Upon information and belief, Defendant ALEXIS MCLEAN ("Dean McLean")

is, and was at all relevant times, employed by CUNY and MEC as the Interim Dean of Student

Affairs at MEC.

45.     Upon information and belief, Dean McLean's primary place of business is located

at 1637 Bedford Avenue, S205-B Brooklyn, NY 11225, and her primary place of residence is

unknown to Plaintiff.

46.     Dean McLean is the current Dean of Student Affair/Office of Student Affairs at

MEC/CUNY. According to the MEC/CUNY website, Dean McLean is a powerful and

influential member of the MEC/CUNY community, and is described by the school

(https://ares.mec.cuny.edu/student-affairs/) as follows:

> Dr. Alexis McLean is the Chief Student Affairs Officer and Interim Dean of
> Student Affairs at Medgar Evers College (CUNY). She is responsible for
> supporting a robust student life agenda that promotes the growth and development
> and academic success of every Medgar Evers College student. She oversees
> programming, policy implementation and personnel administration for the entire
> Division, including Athletics, Student Life, and Counseling, Differently-Abled,
> Health and Interfaith Services. She also has direct oversight of the College's Men's
> and Women's Centers, and coordinates the structure of an environment conducive
> to the personal, social, and intellectual growth of students. This includes providing
> leadership regarding campus advocacy efforts that address students' non-academic
> needs and/or challenges, especially housing and food insecurity (via the Transition
> Academy). Previously, Dr. McLean was a Doctoral Lecturer in the Department of

Special Programs/Percy E. Sutton SEEK Program, where she provided students with academic and personal counseling, and taught courses focused on helping SEEK students acquire the psychosocial skills needed to succeed in college and upon graduation. She also served as SEEK's Associate Director, and spearheaded SEEK's advisement and curriculum matters, and professional development initiatives for MEC's core advising units. In 2015, Dr. McLean founded POWWER! ™ (Passionate Outstanding Women Who Effortlessly Rock!), which highlights extraordinary women who have advanced in their field while simultaneously serving and shaping their communities. Recent honorees include Assemblywoman (and MEC alum) Diana Richardson and Dr. Juhanna Rogers of "The Great 8." Dr. McLean's research interests primarily focus on access and success in education, the role of institutional agents at educational institutions, and race and ethnicity in higher education, particularly as they relate to Black students' experiences. This includes the impact of hip-hop pedagogy in counseling courses, and inquiries about the ways in which Black women navigate the doctoral completion process. Her research has allowed her to facilitate numerous workshops, and present and speak at the city, state and national level. She recently co-authored and published *A Seat At The Table: Womanist Narratives of Black Mothers in Doctoral Programs*, which focuses on how the intersection of race, gender and motherhood impact Black women pursuing a terminal degree.

Dr. McLean holds a Bachelor's degree in Psychology from Pennsylvania State University, and a Master's in Mental Health and Wellness and Doctorate in Higher Education Administration from New York University.

47.     Thus, upon information and belief, Dean McLean has the authority to provide the relief requested by the Plaintiff.

48.     Further, as set forth below, Dean McLean was personally involved or – at the very least – had some connection to the enforcement of the unconstitutional actions taken against Plaintiff as described herein.

***Johnathon P. Hardaway***

49.     Upon information and belief, Defendant JOHNATHON P. HARDAWAY ("Attorney Hardaway") is, and was at all relevant times, employed by MEC and CUNY as MEC's general counsel.

50.     Upon information and belief, Attorney Hardaway's primary place of business is located at 1441 Broadway, 3rd Floor, New York, NY 10018, and his primary place of residence is unknown to Plaintiff.

51.     According to the MEC/CUNY website, Attorney Hardaway is currently the Chief Legal Officer/Office of the President at CUNY.

52.     Thus, upon information and belief, Attorney Hardaway has the authority to provide the relief requested by the Plaintiff.

53.     Further, as set forth below, Attorney Hardaway was personally involved or – at the very least – had *some* connection to the enforcement of the unconstitutional actions taken against Plaintiff as described herein.

***Rudolph ("Rudy") Crew***

54.     Upon information and belief, RUDOLPH CREW ("President Crew") is, and was at all times relevant to this action, employed by CUNY and MEC as the president of MEC.

55.     President Crew is named in this action in his official capacity, and Plaintiff seeks relief under the *Ex Parte Young* fiction as President Crew as a Court order would require President Crew to exercise power and authority available to him to direct MEC personnel to cease the violations of the law set out herein.

56.     Thus, upon information and belief, President has the authority to provide the relief requested by the Plaintiff.

57.     Further, as set forth below, President Crew was personally involved or – at the very least – had some connection to the enforcement of the unconstitutional actions taken against Plaintiff as described herein.  In the alternative, President Crew violates the legal rights of his

students by allowing disciplinary actions to be taken at MEC *without* his review or delegation of powers allocated exclusively to him under the CUNY Bylaws.

*Félix V. Matos Rodríguez*

58.     Upon information and belief, FÉLIX RODRÍGUEZ ("Chancellor Rodríguez") is, and was at all times relevant to this action, employed by CUNY as the chancellor of CUNY.

59.     Chancellor Rodríguez is named in this action in his official capacity, and Plaintiff seeks relief under the *Ex Parte Young* fiction as a Court order would require Chancellor Rodríguez to exercise power and authority available to him to direct CUNY and MEC personnel to cease the violations of the law set out herein.

60.     Thus, upon information and belief, Chancellor Rodríguez has the authority to provide the relief requested by the Plaintiff.

61.     Further, as set forth below, Chancellor Rodríguez was personally involved or – at the very least – had some connection to the enforcement of the unconstitutional actions taken against Plaintiff as described herein.

## RELEVANT NON-PARTIES

*Community Board 9*

62.     Upon information and belief, the local government body Community Board 9 exists to serve the neighborhoods of South Crown Heights, Prospect Lefferts Gardens, Wingate and portions of North Flatbush.

63.     Community Board 9 (herein, sometimes "CB 9") has for some years been at the center of an ongoing and ever more tumultuous gentrification controversy.

64.     Of relevance to this case, in or around early the City began "looking at rezoning a one-mile section of Empire Boulevard, now lined with commercial uses like auto repair shops

and storage facilities" for development of "as many as ten luxury towers[in] Prospect-Lefferts Gardens, one of the most densely populated communities in Brooklyn ... Residents lost their fight against the construction of a 23-story residential building on the edge of the district, at 626 Flatbush Avenue, which can be seen looming over Prospect Park."  Sarah Crean, <u>Turmoil at Community Board Reflects Intensity Of Change In Brooklyn</u>, BKLYNER (Feb. 17, 2016), available at <u>https://bklyner.com/turmoil-at-community-board-9-reflects-intensity-of-change-in-brooklyn-ditmas-park/</u>

65.    In brief, as set out in the article cited above, "[r]enters in CB 9 [have been] forced out by landlords using 'highly questionable tactics.'"  *Id.*

66.    Thus, local activists and members of the MEC student community like Ms. Fletcher regard Community Board 9 as having come to be dominated by real estate developers.

67.    Indeed, demonstrations and verbal exchanges at Community Board meetings are often intense and the Board has long been called "dysfunctional" by some.  *See generally, for example*, Sam Raskin, <u>Fred Baptiste Hopes to Rein In Dysfunctional Crown Heights Community Board</u>, BKLYNER (July 26, 2019), available at <u>https://bklyner.com/fred-baptiste-hopes-to-rein-in-dysfunctional-crown-heights-community-board/</u>.

68.    As it has become more developer-dominated, Community Board 9 has attempted to use law enforcement to rid itself of some of its most visible adversaries and critics.

69.    Similarly, upon information and belief, it has previously held meetings in rented hospital auditoriums and then attempted to use HIPAA laws to avoid needing to disclose the details of those meetings.

70.     In short, upon information and belief, Community Board 9 has a history of using tactics ranging from legally questionable to downright frivolous or illegal to chill core First Amendment speech.

## OTHER RELEVANT BACKGROUND

71.     Ms. Fletcher, by and through counsel, has requested certain materials using New York's Freedom of Information Law ("FOIL") from a number of the relevant actors in this process, including Councilwoman Cumbo, MEC, and CB 9.

72.      True copies of (1) the substantively identical FOIL request made to MEC, CB 9 and Councilwoman Cumbo, (2) MEC/Hardaway blanket denial of that request, (3) the appeal made to CUNY/MEC's FOIL appeal officer, (4) the decision reversing the blanket denial and refusal to respond by email,[2] and (5) the subsequent request made required to obtain the proper certification that certain records do not exist (two of three attachments omitted because they are reproduced elsewhere) are collectively attached hereto as **Exhibit 1**.

73.     True copies of relevant records produced in response are attached as follows:

    i.  **Exhibits 2/3**:  May 2019 email thread between Dean McLean's office and Councilwoman Cumbo's office (different versions provided because redactions differ between versions produced by MEC/Councilwoman Cumbo, and the fact of certain redactions is included as a fact to support certain legal conclusions).  Exhibit 2 was produced by Councilwoman Cumbo's Office

---

[2] Attorney Hardaway initially suggested he would be responding to the FOIL request, taking months to "review" records and requesting a waiver from Plaintiff in order to produce records to Plaintiffs counsel.  However, he ultimately issued a blanket denial and refused to respond electronically (as is required by FOIL), saying, "The College gets a substantial amount of FOIL request and it is not reasonable to send an email asking for a email after the College has sent certified mail mail [sic].  This will be the last time you receive email from me related to FOIL request."

while Exhibit 3 was produced by MEC (redacting Coucilwoman Cumbo's

request that MEC violate the CUNY Bylaws).

    ii.  **Exhibit 4**:  May 3, 2019 email from Dean McLean to Coucilwoman Cumbo's

office (seeming to reference documents that MEC later asserted do not exist).

    iii.  **Exhibit 5**:  May 20, 2019 Affidavit of Dean McLean.

    iv.  **Exhibit 6**:  October 16, 2019 Certification of Johnathon Hardaway that "no

documents responsive" to certain, follow-on FOIL requests exist.

    v.  **Exhibit 7**:  May 2019 email thread between Councilwoman Cumbo's Office

and the CB 9 chairperson.

74.    Attached hereto as **Exhibit 8** is a true copy of correspondence between Plaintiff's

counsel and the CUNY General Counsel regarding the FOIL appeal and the existence of various

records.

## STATEMENT OF FACTS

75.    On April 30, 2019, Ms. Fletcher attended a characteristically contentious meeting

of Community Board 9, at which she engaged in purely political speech protesting

Councilwoman Cumbo, before the meeting was called to order.

76.    This meeting and protest took place in a school auditorium on the campus of

MEC.

77.    Councilwoman Cumbo and Ms. Fletcher began arguing with one another, with

raised voices, but neither woman did any more than raise their voice.

78.    Ms. Fletcher was approached by campus security and asked to leave the

auditorium, which she did, fully cooperating with security.

79. Ms. Fletcher's speech at the CB 9 meeting is, as a matter of squarely decided law, completely protected by the First Amendment.  *See People v. Pruden*, DKT. NO. 2015SK015273, (Kings Cty. 2015) (attached as **Exhibit 9**, as the decision is unpublished) (no criminal charges lie for conduct **at a Community Board 9 meeting** because "standing, yelling and chanting, constitutes constitutionally protected speech and cannot be the sole basis for a charge of Disorderly Conduct.").[3]

***MEC Commences Disciplinary Proceedings at the Instruction of Councilwoman Cumbo.***

80. The very next day, Ms. Fletcher received a notice that MEC was using the Extraordinary Emergency Suspension power under Article XV of the CUNY Bylaws to suspend her.  A true copy of that notice is attached hereto as **Exhibit 10**.

81. In relevant part, Article XV(j) provides (paragraph breaks added for clarity):

j. The president or her/his designee may in emergency or extraordinary circumstances, temporarily suspend a student pending an early hearing as provided in this bylaw section 15.4. to take place within not more than twelve (12) calendar days, unless the student requests an adjournment.

Such suspension shall be for conduct which impedes, obstructs, impairs or interferes with the orderly and continuous administration and operation of any college, school, or unit of the university in the use of its facilities or in the achievement of its purposes as an educational institution. Prior to the commencement of a temporary suspension of a student, the college shall give the student oral notice (which shall be confirmed via email to the address appearing on the records of the college) or written notice of the charges against her/him and, if she/he denies them, the college shall forthwith give the student an informal oral explanation of the evidence supporting the charges and the student may present informally her/his explanation or theory of the matter.[4]

When a student's presence poses a continuing danger to person or property or an ongoing threat of disrupting the academic process, notice and opportunity for denial and explanation may follow suspension, but shall be given as soon as feasible thereafter. The complainant shall be notified in the event that an emergency suspension is imposed

---

[3] As noted below, MEC attempted to introduce — without the required notice under the CUNY Bylaws — a copy of the New York State Disorderly Conduct Statute as "evidence" against Ms. Fletcher in disciplinary proceedings, wholly ignoring the First Amendment limitations on the statute.
[4] Hereinafter, for convenience, a suspension under this part of Article XV(j) is referred to as an "Ordinary Emergency Suspension" or "OES."

against a student, and/or when the suspension is subsequently lifted to the extent that the suspension involves the complainant in the same manner notice is given to the student.[5]

82.    The charges MEC made against Plaintiff were only disclosed later, on May 3, 2019 — thus the suspension imposed in Exhibit 10 falls into the EES category.

83.    However, upon information and belief, President Crew did not make *any* determination that Ms. Fletcher's "presence poses a continuing danger to person or property or an ongoing threat of disrupting the academic process." *See* Exhibit 6 at ¶ 2 (confirming no records exist reflecting such a determination).

84.    Nor did Dr. Crew make any determination of the kind necessary for the less restrictive **OES**, since no record of such a determination was produced in response to Exhibit 1. Exhibit 1 at 1-3 (seeking "any … record concerning, Ms. Fletcher's emergency suspension from Medgar Evers College," describing as part of the records sought that, if the CUNY Bylaws were followed, "Dr. Crew apparently determined that, by engaging in purely verbal protest at a public government meeting … . Ms. Fletcher's words posed an emergency/extraordinary circumstance and further constituted 'conduct which impedes, obstructs, impairs or interferes with the orderly and continuous administration and operation of any college, school, or unit of the university in the use of its facilities or in the achievement of its purposes as an educational institution,'" and concluding "Ms. Fletcher is … **entitled to know how the proceeding against her was commenced**") (emphasis added).

---

[5] Hereinafter, for convenience, a suspension under this part of Article XV(j) is referred to as an "Extraordinary Emergency Suspension" or "EES."

85.     According to the Affidavit prepared by Dean McLean, it was not until two days **after** the EES was issued that anyone at MEC or CUNY conducted "an analysis of the facts and evidence."[6]  Exhibit 5, ¶ 11.

86.     Upon information and belief, Dr. Crew never made any delegation of his authority under CUNY Bylaw XV(j) to any other person.  Exhibit 6 at ¶ 3.[7]

87.     Nor was any written complaint of any kind filed with MEC.  Exhibit 6 at ¶ 5.

88.     Instead, upon information and belief, the disciplinary process began solely based upon a phone call from Councilwoman Cumbo to Dean McLean.  *See* Exhibit 6 at ¶ 5 (no "record or complaint that *began* the disciplinary process" exists); at ¶ 1 (no "evidence" provided to Dean McLean exists, despite Dean McLean's sworn statement otherwise — *see* Ex. 5 ¶ 5); Exhibit 2 at 2 (May 3, 2019 email from Dean McLean to Councilwoman Cumbo's office, seemingly precipitated by an early communication, as it states its purpose is to "update Council Member Cumbo on the progress the College has made in redressing what occurred during the NYC Community Board 9 meeting on April 30, 2019"); Exhibit 6 ¶ 4 (no records exist "reflecting the decision to — or facts underlying the decision to — commence a disciplinary proceeding against Ms. Fletcher prior to [the May 1, 2019, 5:02 p.m. email attached hereto as Exhibit 10.").

89.     As the disciplinary process moved forward, Dean McLean even prepared a sworn affidavit that intentionally, falsely stated that "[o]n May 1, 2019," she "received evidence

---

[6] Given that it contains other statements that all of MEC, CUNY, and Johnathon Hardaway have asserted are false, this Complaint does not treat the McLean Affidavit as authoritative.  *See e.g.*, ¶ 89, below.  However, since Dr. Crew, through Johnathon Hardaway, has disclaimed making **any** determination, Dean McLean's statement of **when** she conducted an "analysis of the facts and evidence" might still be credited.

[7] While MEC did not assert with any specificity that it had such a delegation, but the delegation was exempt from FOIL — as it would have needed to in order to withhold it.  *See Katz v Scott*, 236 AD2d 259, 259 (1st Dept 1997). In any event, such an assertion would be legally incorrect:  under the express terms of FOIL, such a delegation would fit under the required disclosure of "instructions to staff that affect the public" and "final agency policy or determinations."  *See* FOIL § 87(g)(ii); (iii).

regarding Ms. Fletcher's conduct during an April 30, 2019 Community Board 9 Brooklyn meeting."  *See* Exhibit 5 ¶ 5 (Dean McLean swearing to statement quoted); Exhibit 6 at ¶ 1 (certification of Johnathon Hardaway that no such "evidence" was ever "received" and therefore could not be produced or withheld under FOIL).

90.     Throughout the disciplinary process, Ms. Fletcher and her counsel have repeatedly demanded that MEC and CUNY produce the initial complaint commencing this process, or even merely identify the complainant.

91.     In response, MEC and CUNY consistently failed to do so.[8]

92.     This culminated during the hearing at which Ms. Fletcher was found not responsible for any violation, MEC's representative asserted that the "complainant" was MEC itself, without any explanation.

93.     However, upon information and belief, MEC does not commence disciplinary proceedings without the involvement of a human being making a complaint of some kind.

94.     Upon information and belief, no human being other than Councilwoman Cumbo made any complaint about Ms. Fletcher (as reflected by the use of the word "update" in Exhibit 2 at 2).

***MEC Repeatedly Refuses to Comply with Basic Procedural Guarantees or the CUNY Bylaws.***

---

[8] In such communications, authority was repeatedly provided for the request, including, for example, *Matter of Kickertz v. New York Univ.*, 99 A.D.3d 502 (Appellate Division 1st Dept. 2012) (academic discipline was constitutionally illegitimate where expelled student "was not afforded any, let alone a fair, opportunity to cross-examine the witnesses whose accusations were the basis of the charges lodged against her"); *Studefin v. New York City Taxi & Limousine Com.*,135 Misc. 2d 923 (Supreme Court, New York County 1987)  ("The complaint herein, if sustained, could and, it is alleged, did affect his right to drive a taxicab in New York City and to earn a living thereby, clearly a personal property right to be protected.  **In withholding the identity of his accuser**, he was effectively prevented from utilizing conventional methods of investigatory discovery to inquire into her background so far as that would lead to information which might have affected her testimonial credibility") (emphasis added).

95.     In proceeding to the Faculty Student Disciplinary Committee ("FSDC") hearing provided for by the CUNY Bylaws, MEC, acting through Dean McLean and Johnathon Hardaway failed to comply with numerous basic procedural guarantees and the CUNY Bylaws.

96.     Despite Article XV(f) requiring that "[n]otice of at least ten (10) calendar days shall be given to the respondent in advance of the hearing unless the respondent consents to an earlier hearing," MEC never noticed a hearing with that much notice.

97.     Ms. Fletcher never consented to a hearing without at least ten (10) calendar days notice, and repeatedly objected to MEC's violation of this rule.

98.     Nonetheless:

a.   MEC initially sent notice of a May 10 hearing on May 3.

b.   MEC then sent notice of a May 15 hearing at 7:30 p.m. on May 13.

c.   MEC finally sent notice of a May 20 hearing on May 14.

d.   In refusing to provide the required time, MEC *then* asserted that two adjournments had been "granted" and refused to grant more, despite the May 20th hearing being scheduling during MEC's finals period and on a mere six days' notice.

99.     Despite Article XV(h) requiring that "[a]t least five (5) calendar days prior to the commencement of a student disciplinary hearing, the college shall provide … access to review any documents or other tangible evidence that the college intends to use at the disciplinary hearing" and specific, unambiguous representations during that document inspection (since it was five days before May 20) that no additional documents would be relied upon, the College sent additional documents on May 17.  The document provided late was simply a photocopy of New York's disorderly conduct statute.

100.     Attached hereto as **Exhibit 11** is a true copy of a May 17, 2019 email thread, with the top email being a message from Dean McLean to Ms. Fletcher's counsel.

101.     In Exhibit 11, MEC, acting through Dean McLean refused to allow Ms. Fletcher to appeal or otherwise challenge in any manner whatsoever, the initial imposition of an EES, insisting instead that she only had the right to challenge "whether <u>additional</u> discipline for Ms. Fletcher's April 30th conduct is warranted."  Exhibit 11 at 1 (emphasis in original) (going on to state "Although the College was justified in issuing the emergency suspension and met all CUNY procedural requirements, the FSDC will not be determining the sufficiency of the emergency suspension. The responsibility of the FSDC is to determine if Ms. Fletcher must accept the charges put forth by the College (which are in the Notice of Hearing and Charges issued on May 3, 2019). Once again, they will make a determination regarding <u>additional</u> discipline.") (repeated emphasis also in original).

102.     Dean McLean, in Exhibit 11, also falsely stated that her office had liaised with the Chairperson of the FSDC as to certain matters.

103.     The CUNY Bylaws, in Article XV(q)(2), provides that upon request of a respondent, it is the responsibility of the chairperson of the FSDC to determine "an open public hearing would adversely affect and be disruptive to the committee's normal operations."

104.     In Exhibit 11, Dean McLean states, "Per Article XV, the Chairperson has the right to deny this request and hold a closed hearing. This hearing will be a closed hearing."  Exhibit 11 at 1.

105.     At the hearing on May 20, 2019, however, the Chairperson made clear he had not denied — or even heard — any such request and demanded that the MEC representative in attendance "explain."  No explanation was made.

106.    However, by that time, the denial had already had its desired effect:  Ms. Fletcher was not able to rally community support for her at the hearing, given the time constraints, exams, and probability that the hearing would be illegitimately made a "closed hearing."

107.    Thus, with no benefit to "opening" the hearing, Ms. Fletcher did not pursue the request the day of the hearing.

108.    Subsequently, FOIL practice revealed the source of the demand the hearing be "closed":  an express request from Councilwoman Cumbo.

109.    Specifically, on May 5, 2019, Councilwoman Cumbo's Chief of Staff wrote to Dean McLean and Johnathon Hardaway:

> **Please share with your colleagues and senior leadership that the Majority Leader would like this hearing to be to "closed" to the public**, and she would appreciate only the essential participants to be part of the hearing. At this time, the Majority Leader will not be attending the hearing but if anything changes our office will be in touch as soon as possible.

Exhibit 2 at 1-2 (emphasis added).

110.    Dean McLean, Johnathon Hardaway, and any other members of MEC's "senior leadership" with whom this request was shared put Councilwoman Cumbo's request into effect, abrogating and violating Ms. Fletcher's rights.

111.    Despite the naked violation of the CUNY Bylaws, no member of MEC's "senior leadership" — including Dean McLean and Johnathon Hardaway — intervened.

***The FSDC Hearing Involves MEC Presenting Basically No Case, and Ends on a Motion to Dismiss.***

112.    Attached hereto as **Exhibit 12** are the disciplinary charges faced by Ms. Fletcher, disclosed on May 3, 2019 after the EES was already in place.

113.    At the FSDC hearing, MEC, acting through a representative, presented a case that involved calling only two witnesses (two "CPOs," or campus police officers, named Smith and Howard), and presenting a short, grainy, soundless video.

114.    The document containing the charges against Ms. Fletcher presented a factual narrative, including allegations that Ms. Fletcher "failed to comply with [CPO's] lawful[9] directives" and that those CPOs "had to forcefully escort [Ms. Fletcher] out of the auditorium." Exhibit 12 at 1.[10]

115.    Upon information and belief, Dean McLean falsely invented these allegations from whole cloth.

116.    In the alternative, upon information and belief, Councilwoman Cumbo falsely invented these allegations from whole cloth and communicated them in a phone call to Dean McLean.

117.    When CPO Smith and CPO Howard testified at the FSDC hearing, they unambiguously testified Ms. Fletcher did not ever fail to comply with any direction they gave.

118.    When CPO Smith and CPO Howard testified at the FSDC hearing, they unambiguously testified that they did not use any force.

119.    Though the video of the "incident" is grainy and soundless, it does show that there was any failure to comply with direction, or that there was any force used.

---

[9] Independent of other issues, and as presented in the motion to dismiss granted at the FSDC hearing, a directive to cease speech at a government function is likely unlawful.

[10] Exhibit 12 is written such that it appears, facially, that these allegations are a quotation from *something*. However, according to the Certification of Johnathon Hardaway, there is no document that exists that Exhibit 12 could be quoting, since any such factual observations would need to be disclosed. *NY 1 News v Off. of the President*, 231 AD2d 524, 525 (2d Dept 1996) ("[f]actual observations are not exempt from disclosure, even in documents issued before final decision."); Exhibit 6 (FOIL certification that no responsive records reflecting these facts). Thus, as alleged in ¶¶ 115 - 116, these allegations were maliciously and falsely invented from whole cloth and placed in quotation marks to give the false statements an air of legitimacy.

120.     Instead, CPO Smith and CPO Howard — consistent with the video — both testified with specificity that Ms. Fletcher was perfectly cooperative with every directive that they gave, and that when asked, she left the auditorium.

121.     Further, CPO Smith and CPO Howard testified that other people in the auditorium, including Councilwoman Cumbo herself, refused directions to leave the auditorium and faced no consequences whatsoever.

122.     After presenting the testimony of CPO Smith and CPO Howard, MEC rested.

123.     Pursuant to Article XV(q)(3) of the CUNY Bylaws, "[a]t the conclusion of the college's case, [Ms. Fletcher] moved to dismiss the charges."

124.     A true copy of the resulting FSDC Decision granting that motion is attached hereto as **Exhibit 13**.

125.     The motion to dismiss the charges was granted and every single allegation was dismissed as "not established," Ms. Fletcher was found "not responsible" of all charges, and the FSDC "determined that Ms. Sakia Fletcher receive no sanction."  Exhibit 13 at 2-3.

126.     Notwithstanding that ruling, at no point has MEC withdrawn its position that it was "justified in issuing the emergency suspension," nor has it permitted Ms. Fletcher a single opportunity to challenge that or otherwise clear her name.

## CLAIMS AND GROUNDS FOR RELIEF

### COUNT ONE
### First Amendment Retaliation through 42 U.S.C. § 1983 and related New York State Constitutional Provisions
### (*against* All Defendants)

127.     "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d

Cir. 2013); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (First Amendment prohibits "adverse governmental action taken against an individual in retaliation" for protected activities.). *Cf. also, Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 782-83 (2d Cir. 1991) ("While every breach of a public employment contract may not be a deprivation of property within the meaning of the Due Process Clause, the adverse action taken in this case was not the product of routine discipline.") (citation omitted).

128.     As a result, even some government actions that would be otherwise lawful become prohibited if in response to protected speech or petition.  "Because government retaliation tends to chill an individual's exercise of his First Amendment rights, public officials may not, as a general rule, respond to an individual's protected activity with conduct or speech even though that conduct or speech would otherwise be a lawful exercise of public authority." *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 688 (1996).  The First Amendment thus bars officials' actions where they "caused [the speaker] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity" and were "substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."  *See Keenan*, 290 F.3d at 258.

129.     The right to protest is at the heart of the First Amendment, as is the right to publicly and loudly criticize public officials.

130.     The Defendants actions, collectively and through *respondeat superior*, constitute illegal First Amendment retaliation in that (1) Ms. Fletcher was exercising a right protected by the First Amendment; (2) the imposition of discipline at all, as well as the falsification of charges, and the denials of process, were motivated or substantially caused by the exercise of

that right; and (3) those actions caused injury  *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d

Cir. 2013).

131.     Even in the generally fraught criminal context, merely "[b]eing subjected to

criminal charges is a cognizable concrete harm."  *Higginbotham v. City of New York*, 2015 WL

2212242, at *11 (SDNY May 12, 2015).  Here, Ms. Fletcher's protected speech was the but-for

cause of her facing disciplinary proceedings, as well as needing to navigate the malicious abuse

of the CUNY disciplinary system directed by Councilwoman Cumbo and executed by Johnathon

Hardaway and Dean McLean.

132.     Causation may be inferred by proximity in time.  Here, Ms. Fletcher faced

process-less discipline, the day after her speech, literally premised on that speech.

133.     More specifically, Councilwoman Cumbo's actions, in demanding and/or

requesting that MEC, Dean McLean, Johnathon Hardaway, CUNY (and through those entities,

the City of New York) take certain punitive actions and deny certain rights to Ms. Fletcher was

intended to deter and chill Ms. Fletcher's exercise of her First Amendment right to protest

government activity and criticize government officials.  *See e.g.,* Exhibit 2 at 1-2 ("Please share

with your colleagues and senior leadership that the Majority Leader would like this hearing to be

to 'closed' to the public").

134.     MEC, Dean McLean, Johnathan Hardaway, and CUNY, by following those

directives, failing to intervene, and acting in a manner designed to appease and placate

Councilwoman Cumbo, and to deter future exercise of constitutionally protected expression in a

manner that displeased powerful politicians.  *See e.g.*, Exhibit 2 at 2:

> Hello Monica,
>
> Once again, please convey my and Johnathon Hardaway's (carbon copied on this email) apologies to Council Member Laurie Cumbo. We are both disappointed that this incident occurred at all and that a Medgar Evers College student was involved. As Dean of Student Affairs here at the College, I assure you that the actions of Sakia Fletcher are an aberration and in no way emblematic of the typical behavior of the College's student body.
>
> I am sending you this email to update Council Member Cumbo on the progress the College has made in redressing what occurred during the NYC Community Board 9 meeting on April 30, 2019.
>
> **The Disciplinary Process**
>
> The College has scheduled a disciplinary hearing for Friday, May 10, 2019 at 9:30 AM in Room 307 at 1637 Bedford Avenue in Brooklyn. The student has the ability to request that the hearing be open to the public. The Chair of the disciplinary committee may decide to keep the hearing closed to the public.
>
> The College will provide documentary and witness testimony and witness affidavits evidencing Ms. Fletcher's April 30th behavior. Please let me know if Council Member Cumbo would like to either provide a statement to be read at the hearing or testify in person.

135. Again, in this email, "this incident" refers to pure First Amendment speech, at a meeting of a community board that is well-known to be "dysfunctional," raucous, and contentious.

136. Upon information and belief, no one involved in any stage of MEC's disciplinary process receives any guidance or training on the First Amendment.

137. No CUNY Bylaw specifically sets out protections for First Amendment activity.

138. Therefore, the CUNY/MEC Defendants are liable under this claim under *respondeat superior*, as well as for failure to train persons who will handle disciplinary matters, under *Monell v. Department of Social Services*, 436 U.S. 468 (1978) and its progeny.

139. In addition to being retaliatory, the disciplinary actions taken by the Defendants, and imposed on the basis of Ms. Fletcher's exercise of her First Amendment rights, as complained of herein were:

a.  Not content-neutral and lacked narrowly tailoring to promote a compelling government interest; and/or

b.  Content-neutral, but lacked narrow tailoring to serve a significant governmental interest and/or failed to provide ample alternatives for expression; and/or

c.  Afforded Defendants unbridled discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant vagueness and overbreadth concerns).

140.    In no event can any Defendant justify the use of the EES — or even the less severe OES — mechanism for conduct that constitutes pure speech, and such use will almost always result in overbroad or over-inclusive regulation of protected conduct, because immediate discipline for political speech will almost never be narrowly tailored to serve significant governmental interests, and almost always fail to provide ample alternatives for expression.

141.    Additionally, the failure of CUNY and MEC to train any disciplinary personnel with regard to the First Amendment restrictions on government action is a manifest failure to provide adequate safeguards to prevent school officials on the streets from enjoying and exercising unbridled, unreviewable discretion to suppress protected speech and conduct — apparently, as occurred here, at the direction of powerful politicians seeking to explicitly quell dissent — thus inevitably leading to violations of the constitutional prohibitions against viewpoint discrimination and other, related guarantees.

142.    On this Count, Ms. Fletcher respectfully prays for all the relief set out below.

**COUNT TWO**
**Violation of Plaintiff's Rights to Due Process of Law, through 42 U.S.C. § 1983 and related New York State Constitutional Provisions**
**(*against* All Defendants)**

143.    "[T]he Supreme Court has held that an … agency must adhere to its own regulations." *Singh v. United States DOJ*, 461 F.3d 290, 296 (2d Cir. 2006), *citing Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").  "This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016).

144.    In disciplinary proceedings a student must "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975) .

145.    Where an adverse action is "not the product of routine discipline," it can and often does constitute a "deprivation of property within the meaning of the Due Process Clause." *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 782-83 (2d Cir. 1991).  *See also, id* at 789 (Timbers, J., concurring in part and dissenting in part) (disagreeing that the case before the Court constituted non-routine discipline, and providing as a counter example:  "A public employer who harassed an employee in order to induce him to give up a substantive constitutional right, such as freedom of speech, would be violating the Fourteenth Amendment and section 1983.").

146.    And, "[t]here is no question that Plaintiff has a 'liberty' or 'property' interest in her dealings with her state-run college as New York has recognized 'an implied contract between a public college and its students.'" *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 337 (E.D.N.Y. 2014) (alterations adopted), *quoting Olsson v. Board of Higher Ed.*, 49 N.Y.2d 408, 414, 402 N.E.2d 1150, 426 N.Y.S.2d 248 (1980).

147.    "The essence of the implied contract is that an academic institution must act in good faith in its dealings with its students." *Olsson*, 49 N.Y.2d at 414. "Such an implied contract, recognized under state law, provides the basis for a property interest that would be entitled to constitutional protection." *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir.1991).

148.    Part of that "implied contract" is the CUNY Bylaws: those Bylaws spell out the nature of the relationship between CUNY and its students.

149.    As set out in paragraphs 95-126 above, Defendants consistently refused to abide by the basic procedural guarantees provided in the CUNY Bylaws, in order to punish and deter Plaintiff's core First Amendment speech, and to induce her to give up her substantive Constitutional rights.

150.    That failure, standing alone, violated Plaintiff's right to due process.

151.    Moreover, at the risk of stating the obvious, due process requires *some* process.

152.    To this day, Defendants have not provided *any* mechanism for Plaintiff to challenge the initial issuance of a suspension, and have refused to even *hear* Plaintiff's timely-served appeal.

153.    Rather, Defendants only permitted a challenge to "whether <u>additional</u> discipline for Ms. Fletcher's April 30th conduct is warranted." Ex. 11 at 1 (emphasis in original). Defendants explained that, in fact, the FSDC could not even address the emergency suspension: "Although the College was justified in issuing the emergency suspension and met all CUNY procedural requirements, the FSDC will not be determining the sufficiency of the emergency suspension." *Id*.

154.    Therefore, in the alternative, either:

a.  CUNY/MEC has a policy and practice of not allowing any challenge whatsoever to emergency determinations and suspensions; OR

b.  The individual Defendants violated CUNY/MEC's policies and practices, acting on direction or suggestion of Councilwoman Cumbo, in refusing to hear an appeal or allow the FSDC to "determin[e] the sufficiency of the emergency suspension."

155.    In either event, Defendants violated Plaintiff's rights by failing to provide a pre-deprivation hearing in a circumstance that presented no exigency whatsoever, and failing to provide *any* post-deprivation remedy.[11]

156.    According to Defendants, there is no post-deprivation remedy to exhaust for the emergency suspension, and in any event, Plaintiff has exhausted any available remedy by filing an appeal that went unaddressed.

157.    Furthermore, by withholding the identity of Plaintiff's accuser, regardless of applicable rules, Defendants violated Plaintiff's rights to process.  *See, e.g., Matter of Kickertz v. New York Univ.*, 99 A.D.3d 502 (1st Dept. 2012); *Studefin v. New York City Taxi & Limousine Com.*,135 Misc. 2d 923 (Supreme Court, New York County 1987), *cited supra*, n. 8.

158.    On this Count, Ms. Fletcher respectfully prays for all the relief set out below.

## COUNT THREE
### Manufacturing of False Evidence in Violation of 14th Amendment, through 42 U.S.C. § 1983 and related New York State Constitutional Provisions
### (*against* Defendant McLean and the CUNY/MEC Defendants)

159.    Where a person has been deprived of liberty as a result of false evidence that is manufactured, there is a deprivation of liberty that violates due process of law.  *See Mooney v. Holohan*, 294 US 103 (1935).

---

[11] Plaintiff reads the CUNY Bylaws to allow appeals of emergency suspensions.  However, to the extent that Defendants argue otherwise, the asserted fact that the CUNY Bylaws fail to provide *any* hearing on emergency suspensions would make it an unconstitutional policy.

160.    "Evidence" refers not only to physical evidence, but also testimony and statements.

161.    Here, as set out above Dean McLean deliberately falsified an affidavit that was used to guide MEC's representative in moving forward with the FSDC Hearing, and with the intent that it be introduced in the hearing.

162.    Specifically, Dean McLean provided a sworn affidavit – for use as evidence in Plaintiff's disciplinary case – that she had possession of "evidence regarding Ms. Fletcher's conduct during an April 30, 2019 Community Board 9 Brooklyn meeting."  Ex. 5 ¶ 5.

163.    However, Defendants have certified that Dean McLean's sworn statement was false.  *See* Ex. 6 ¶ 1 (certification of Johnathon Hardaway that no such "evidence" was ever "received" and therefore could not be produced or withheld under FOIL, in response to a direct inquiry about the McLean Affidavit).

164.    In the alternative, should the "evidence" and "complaint" materialize during litigation, upon information and belief, in that complaint, Councilwoman Cumbo made false statements, which she reasonably understood that Dean McLean would rely upon, and that Dean McLean *did* rely upon, in bringing disciplinary charges against Ms. Fletcher.[12]

165.    The MEC/CUNY Defendants are liable under this count under the doctrine of *respondeat superior*.

166.    On this Count, Ms. Fletcher respectfully prays for all the relief set out below.

**COUNTS FOUR, FIVE, and SIX**
**State Law Abuse of Process, Tortious Interference with Contract, and Breach of Contract**
**(*against* All Defendants)**

---

[12] As noted above, though Plaintiff has diligently sought that complaint through FOIL, but all Defendants seemingly deny that it exists.  Plaintiff sent a contemporaneous spoliation notice, requesting preservation of phone records specifically, and no phone records were produced in FOIL practice.

167.    "In New York, a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v Sheldon*, 41 F3d 73, 80 (2d Cir. 1994).[13]

168.    Here, as set out at length above, there was no "evidence" or even a complaint leading to the issuance of process against Plaintiff.

169.    The process was not intended to serve any legitimate purpose, but rather, exclusively intended to (1) provide a political favor for Councilwoman Cumbo and (2) chill core First Amendment protest and speech.

170.    Neither of these ends are legitimate goals of an academic disciplinary system.

171.    The use of the process was intended to and did cause harm to Plaintiff.

172.    For breach of contract, as set out above, the CUNY Bylaws exist as a contract between CUNY/MEC and their students.  In addition to the Due Process violations above, for the same reasons in paragraphs 146-150 and flowing from the same facts, the CUNY/MEC Defendants breached their contract with Plaintiff.

173.    For tortious interference with contract, Defendants McLean, Hardaway, and Cumbo knowingly and intentionally interfered with Plaintiff's contractual rights under the CUNY Bylaws.

174.    To state a claim for tortious interference with contract, the Plaintiff must allege that (1) they had a contract or business relationship with a third party; (2) the defendant knew of

---

[13] This is brought purely under state law, and not under Section 1983, since academic discipline is not criminal process. *See Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009) ("[S]ection 1983 liability ... may not be predicated on a claim of malicious abuse of ... civil process") (emphasis in original).

that contract or relationship and intentionally interfered with it; (3) the defendant acted solely out of malice or used improper or illegal means that amounted to a crime of independent tort; and (4) the defendant's interference caused injury to the contract or relationship with the third party. *Amaranth LLC v. J.P. Morgan Chase & Co*. 71 AD3d 40 (1st Dept. 2009).

175.    As set out above, Plaintiff had a contractual relationship with MEC/CUNY.

176.    Upon information and belief, all Defendants know of the CUNY Bylaws.

177.    Notwithstanding that knowledge, Defendants Hardaway, Cumbo, and McLean intentionally interfered with Plaintiff's rights and expectations under the CUNY Bylaws, as set out in detail in paragraphs 95-126 above.

178.    The motivation for that interference was to punish and chill First Amendment protected speech.

179.    The interference caused harm in an amount to be determined at trial, including forcing Plaintiff to retain attorneys to defend her basic procedural and contractual rights, as well as emotional distress, and other harms detailed above.

180.    On these Counts, Ms. Fletcher respectfully prays for all the relief set out below.


**COUNT SEVEN**
**New York Freedom of Information Law ("FOIL")**
(***against*** **All Defendants**)

181.    Should any documents that the MEC/CUNY Defendants and/or Councilwoman Cumbo asserted do not exist (e.g., Exs. 1 and 6) come to light during this case – including, for example, *any* "evidence" "received" by Dean McLean, as attested in the McLean Affidavit or the "record or complaint that *began* the disciplinary process" (Ex. 6, emphasis in original) – the initial withholding of those documents violates FOIL, and entitles Plaintiff to free-standing

relief. *See e.g., Ehrich v. Binghamton City Sch. Dist*., 210 F.R.D. 17, 18 (N.D.N.Y. 2002) (noting pendant jurisdiction over FOIL claims).

182.    Withholding records that are known to exist, with a false and unreasonable statement that they do not, violates FOIL, its implementing regulations, and the Uniform FOIL Rules.

183.    Similarly, if such records exist and Defendants claim they were unaware of them, upon information and belief, Defendants' failure to find those records was for lack of a diligent search.

184.    Initially, Attorney Hardaway, after stalling for months and requesting various waivers of rights in order to provide documents, issued a bad faith and improper blanket denial (and refused to provide records electronically), which was reversed on appeal.

185.    Even after the reversal, Attorney Hardaway refused to produce the required certification that a diligent search was made for specified missing records, apparently from the face of the request.

186.    Because of that refusal, Plaintiff was forced to make *another* FOIL request specifically requesting those items in order to obtain a specific certification that a diligent search was made for the specified records.  *See e.g.*, Ex. 6.

187.    Throughout the entire process, Attorney Hardaway acted in bad faith, failed to make diligent searches, and, upon information and belief, provided false statements about the existence of various documents.[14]

---

[14] *See e.g.,* Ex. 8 at 5-6 (email from Plaintiff's counsel to CUNY's General Counsel expressing incredulity about the non-existence of certain documents – "you seem to be asserting that this emergency suspension sprung Athena-like, fully formed from Dean McLean on May 1, 2019 when she sent it to Sakia Fletcher," to which CUNY's General Counsel responded, "I am writing to confirm that we were in close contact with the College late yesterday, and the College states that it has no more documents to produce that are responsive to the FOIL request.").

188.    Where an agency has no reasonable basis for denying access to records and a party substantially prevails (e.g., obtains the records sought), attorneys' fees under FOIL are mandatory.  Pub. Off. Law § 89(4)(c)(ii).

189.    Whether by false statement or by improper assertion of exemptions, the records demanded here (e.g., the initial complaint, communications regarding the emergency suspension, any delegation of suspension authority by Defendant Crew, communications and phone logs relating to communications between MEC and Councilwoman Cumbo) – to the extent they exist – were unreasonable and improper to withhold.  *See Matter of Rauh v. de Blasio*, 161 AD3d 120 (1st Dept 2018) (Mayor wrongfully claimed FOIL exemptions for public documents, including email correspondence between the Mayor and a CONY consultant).

190.    On this Count, Plaintiff requests production of any improperly withheld records and attorneys' fees under FOIL.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff a trial by jury, and further requests that judgment be entered in her favor and against all Defendants, for the claims set out above, and that the Court grant the following:

A. Declaratory relief;
B. An injunction requiring that proper policies, practices, and training be put in place by the City University of New York and by Medgar Evers College, to ensure that students are not disciplined for protected speech on or off campus, and that students are not disciplined without appropriate process;
C. Judgment against Defendants for Plaintiff's asserted causes of action;
D. Compensatory damages (from the non-*Ex Parte Young* Defendants) in an amount to be determined at trial, including the attorneys' fees reasonably involved in defending the disciplinary action;
E. Special and/or punitive damages (from the non-*Ex Parte Young* Defendants);
F. Costs, inclusive of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and N.Y. Pub. Off. Law § 89(4)(c)(ii);
G. Interest; *and*
H. Such other or further relief as the Court deems just and proper.

Dated:  June 1, 2020.

Respectfully Submitted,

/s/
_____

J. Remy Green
**Cohen&Green P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, NY 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com